DeBACKER *v.* BRAINARD, SHERIFF

No. 15.   Argued October 13–14, 1969—
Decided November 12, 1969

*William G. Line,* by appointment of the Court, 394
U. S. 914, argued the cause and filed briefs for appellant.

*Richard L. Kuhlman* argued the cause for appellee.
With him on the brief was *Melvin Kent Kammerlohr,*
Assistant Attorney General of Nebraska.

*Alfred L. Scanlan,* by special leave of Court, argued the cause and filed a brief for the National Council of Juvenile Court Judges as *amicus curiae.*

*Thomas C. Lynch,* Attorney General, *Albert W. Harris, Jr.,* Assistant Attorney General, and *Derald E. Granberg* and *Gloria F. DeHart,* Deputy Attorneys General, filed a brief for the State of California as *amicus curiae.*

PER CURIAM.

After a hearing before a juvenile court judge, appellant DeBacker was found to be a "delinquent child"[1] and ordered committed to the Boys' Training School at Kearney, Nebraska.[2] DeBacker did not seek direct review of his commitment, but instead sought state habeas corpus. The Nebraska District Court dismissed appellant's petition, a divided Nebraska Supreme Court affirmed,[3] and last Term we noted probable jurisdiction over the present appeal, 393 U. S. 1076. Because we find that resolution of the constitutional issues presented by appellant would not be appropriate in the circum-

---

[1] "Delinquent child shall mean any child under the age of eighteen years who has violated any law of the state or any city or village ordinance." Neb. Rev. Stat. § 43–201 (4). Appellant was charged with having a forged check in his possession with the intent to utter it as genuine, an act which for an adult would be forgery under Neb. Rev. Stat. § 28–601 (2).

[2] Appellant was 17 when committed, and it appears that under Nebraska law he could be kept in the training school until his 21st birthday.

[3] Four of the seven justices of the Nebraska Supreme Court thought the Nebraska statutory provisions which require that juvenile hearings be without a jury, Neb. Rev. Stat. § 43–206.03 (2), and be based on the preponderance of the evidence, Neb. Rev. Stat. § 43–206.03 (3), were unconstitutional. The Nebraska Constitution provides, however, that: "No legislative act shall be held unconstitutional except by the concurrence of five judges." Neb. Const., Art. V, § 2.

stances of this case, the appeal is dismissed. See *Rescue Army* v. *Municipal Court*, 331 U. S. 549.

1. Appellant asks this Court to decide whether the Fourteenth and Sixth Amendments, in light of this Court's decisions in *Duncan* v. *Louisiana*, 391 U. S. 145; *Bloom* v. *Illinois*, 391 U. S. 194; and *In re Gault*, 387 U. S. 1, require a trial by jury in a state juvenile court proceeding based on an alleged act of the juvenile which, if committed by an adult, would, under the *Duncan* and *Bloom* cases, require a jury trial if requested. In *DeStefano* v. *Woods*, 392 U. S. 631, we held that *Duncan* and *Bloom* "should receive only prospective application" and stated that we would "not reverse state convictions for failure to grant jury trial where trials began prior to May 20, 1968, the date of this Court's decisions in *Duncan* v. *Louisiana* and *Bloom* v. *Illinois*." 392 U. S., at 633, 635. Because appellant's juvenile court hearing was held on March 28, 1968—prior to the date of the decisions in *Duncan* and *Bloom*—appellant would have had no constitutional right to a trial by jury if he had been tried as an adult in a criminal proceeding. It thus seems manifest that this case is not an appropriate one for considering whether the Nebraska statute which provides that juvenile hearings be "without a jury," Neb. Rev. Stat. § 43–206.03 (2), is constitutionally invalid in light of *Duncan* and *Bloom*.[4]

---

[4] Although a comment made by appellant's counsel at oral argument before this Court (in response to a question) suggests reliance also on the Equal Protection Clause for the claim that a jury trial was constitutionally required (Tr. 5), an examination of the record clearly reveals that this was not any part of the basis on which probable jurisdiction was noted here. Appellant made no equal protection claim before the juvenile court, in his petition for habeas corpus to the state courts, or in his jurisdictional statement or brief in this Court. The Sixth Amendment as reflected in the Fourteenth was the exclusive basis for appellant's claim that he had a right to a jury trial. (See "Questions Presented" in Jurisdictional Statement 3–4, and

2. Appellant next asks this Court to decide whether the preponderance-of-the-evidence standard for burden of proof in juvenile court proceedings, required by Neb. Rev. Stat. § 43–206.03 (3), satisfies the Due Process Clause of the Fourteenth Amendment. However, at the appellant's juvenile court hearing, his counsel neither objected to the preponderance-of-the-evidence standard, nor asked the judge to make a ruling based on proof beyond a reasonable doubt. In explaining why he did not seek a direct appeal from the juvenile court's determination that appellant had committed the act upon which rested the delinquent child finding, appellant's counsel stated at oral argument before this Court:

> "[I]t has been pointed out that I did not attack the sufficiency of the evidence.
> "Of course, the reason for that is obvious. The evidence is more than sufficient to sustain a conviction of what he did. An appeal on the sufficiency of the evidence would have been close to frivolous." (Tr. 41–42.)

Later in oral argument counsel acknowledged that "[n]o matter what the standard was . . . [o]ur evidence just isn't insufficient." (Tr. 47.) And when specifically asked whether "[t]he evidence was sufficient even under a reasonable doubt standard," counsel responded: "Even under a reasonable doubt standard . . . ." (Tr. 47.)

Given this commendably forthright explanation by appellant's counsel, this case is not an appropriate vehicle for consideration of the standard of proof in juvenile proceedings.[5]

---

Appellant's Brief 2.) Nor has any of the Nebraska courts below passed on any equal protection claim.

[5] This Court has recently noted probable jurisdiction to consider this issue in *In re Winship* (No. 85, Misc.), probable jurisdiction noted, *post*, p. 885.

3. Appellant finally asks us to decide whether due process is denied because, as it is claimed, the Nebraska prosecutor had unreviewable discretion whether he would proceed against appellant in juvenile court rather than in ordinary criminal proceedings. The record shows (1) that appellant did not make this contention before the juvenile court judge; (2) that appellant raised the issue in his habeas corpus petition but that it was not passed on by the Nebraska District Court; (3) that appellant did not press the District Court's failure to consider this issue in his appeal to the Nebraska Supreme Court, and made only passing reference to the issue in his brief to that court; and (4) that the opinions of the Nebraska Supreme Court did not pass on the issue, or even refer to the contention. Given the barrenness of the record on this issue, in the exercise of our discretion, we decline to pass on it. So far as we have been made aware, this issue does not draw into question the validity of any Nebraska statute.[6] Therefore, it could not, standing alone, be subject to review in this Court by way of an appeal. See 28 U. S. C. § 1257 (2). "[I]nsofar as notation of probable jurisdiction may be

---

[6] In his petition for state habeas corpus, appellant did not allege as to this issue that any Nebraska statutory provision was invalid. Instead he claimed: "Petitioner is deprived of his liberty under the Fourteenth Amendment of the Constitution of the United States when his right to a jury trial and the protective procedures of the criminal code are left to depend on the uncontrolled discretion of the prosecutor as to whether petitioner should be proceeded against in juvenile court or should be informed against in District Court under the provisions of the code of criminal procedure." If it can be fairly said that the prosecutor's discretion under Nebraska law is "uncontrolled," or not subject to review, this is not because of any explicit statutory provision making it such, cf. Neb. Rev. Stat. § 43–205.04, but because of language in Nebraska case law. See State v. McCoy, 145 Neb. 750, 18 N. W. 2d 101 (1945); Fugate v. Ronin, 167 Neb. 70, 75, 91 N. W. 2d 240, 243–244 (1958).

regarded as a grant of the certiorari writ" as to this issue, we dismiss such writ as improvidently granted. *Mishkin* v. *New York*, 383 U. S. 502, 513.

For the foregoing reasons this appeal is

*Dismissed.*

MR. JUSTICE BLACK, dissenting.

For the reasons set forth herein and in the dissenting opinion of my Brother DOUGLAS, I dissent and would reverse the judgment below.

In February 1968 appellant, who was then 17 years old, was charged under the laws of Nebraska with being a "delinquent child" [1] because he had a forged bank check which he intended to use for his own purposes.[2] At the hearing on this charge he asked for a jury trial, arguing that this was a right guaranteed him by the Sixth Amendment to the Constitution and that a statute prohibiting juries in "delinquency" proceedings [3] was therefore unconstitutional.

This Court in *In re Gault*, 387 U. S. 1 (1967), held that juveniles charged with being "delinquents" as a

---

[1] Neb. Rev. Stat. § 43–201 (4) provides that: "Delinquent child shall mean any child under the age of eighteen years who has violated any law of the state or any city or village ordinance."

[2] The State charged that appellant "unlawfully, feloniously and knowingly [had] in his possession and custody a certain false, forged and counterfeited bank check . . . with the intent . . . to utter and publish said false, forged and counterfeited bank check as true and genuine, knowing the same to be a false, forged and counterfeited bank check, and with the intent then and there and thereby to prejudice, damage and defraud . . . , well knowing the same to be falsely made, forged and counterfeited, contrary to the form of the Statutes in such cases made and provided, and against the peace and dignity of the State of Nebraska." App. 1–2. It is undisputed that such acts constitute the crime of forgery under state law. Neb. Rev. Stat. § 28–601 (2).

[3] Neb. Rev. Stat. § 43–206.03 (2) provides that juvenile hearings "shall be conducted by the judge without a jury in an informal manner . . . ."

result of committing a criminal act were entitled to certain constitutional safeguards—namely, notice of the issues involved, benefit of counsel, protection against compulsory self-incrimination, and confrontation of the witnesses against them. I can see no basis whatsoever in the language of the Constitution for allowing persons like appellant the benefit of those rights and yet denying them a jury trial, a right which is surely one of the fundamental aspects of criminal justice in the English-speaking world.

The Court here decides that it would not be "appropriate" to decide this issue in light of *DeStefano* v. *Woods,* 392 U. S. 631 (1968). That case held that the Sixth Amendment right to a jury trial—made applicable to the States in *Duncan* v. *Louisiana,* 391 U. S. 145 (1968)—did not apply in state proceedings held prior to May 20, 1968. MR. JUSTICE DOUGLAS and I dissented in that case as we have in every case holding that constitutional decisions would take effect only from the day they were announced.[4] I think this doctrine of prospective-only application is nothing less than judicial amendment of the Constitution, since it results in the Constitution's meaning one thing the day prior to a particular decision and something entirely different the next day even though the language remains the same. Under our system of government such amendments cannot constitutionally be made by judges but only by the action of Congress and the people. Depriving defendants of jury trials prior to *Duncan* violated the Constitution just as much as would similar deprivations after

---

[4] *Linkletter* v. *Walker,* 381 U. S. 618, 640 (1965) (dissenting opinion); *Johnson* v. *New Jersey,* 384 U. S. 719, 736 (1966) (dissenting opinion); *Stovall* v. *Denno,* 388 U. S. 293, 302, 303 (1967) (dissenting opinions); *DeStefano* v. *Woods,* 392 U. S. 631, 635 (1968) (dissenting opinion); *Halliday* v. *United States,* 394 U. S. 831, 835 (1969) (dissenting opinion); see also *Desist* v. *United States,* 394 U. S. 244, 254 (1969) (concurring in judgment).

that decision, yet this Court treats these equal deprivations with clearly unequal justice. I cannot agree to such refusals to apply what appear to me to be the clear commands of the Constitution.

MR. JUSTICE DOUGLAS, dissenting.

In *DeStefano* v. *Woods,* 392 U. S. 631, 635, I stated my view that the decisions in *Duncan* v. *Louisiana,* 391 U. S. 145, and *Bloom* v. *Illinois,* 391 U. S. 194, which guaranteed to adults in serious criminal cases and contempts the right to a trial by jury, should be given retroactive effect.* In light of this view, I am unable to join the Court's *per curiam* opinion in this case, holding that because appellant's juvenile court hearing was held prior to the date of the decisions in *Duncan* and *Bloom* the Court is precluded from deciding appellant's right to a jury trial.

I would reach the merits and hold that the Sixth and Fourteenth Amendments require a jury trial as a matter of right where the delinquency charged is an offense that, if the person were an adult, would be a crime triable by jury. Such is this case, for behind the façade of delinquency is the crime of forgery.

As originally conceived, the juvenile court was to be a clinic, not a court; the judge and all of the attendants were visualized as white-coated experts there to supervise, enlighten, and cure—not to punish.

These white-coated people were surrogates, so to speak, of the natural parent. As stated in one of the leading cases:

"To save a child from becoming a criminal, or from continuing in a career of crime, to end in maturer

---

*This has been my position with respect to all comparable constitutional decisions. See, *e. g., Desist* v. *United States,* 394 U. S. 244, 255–256 (dissenting opinion); *DeStefano* v. *Woods,* 392 U. S. 631, 635 (dissenting opinion); and cases cited therein.

years in public punishment and disgrace, the legislature surely may provide for the salvation of such a child, if its parents or guardian be unable or unwilling to do so, by bringing it into one of the courts of the state without any process at all, for the purpose of subjecting it to the state's guardianship and protection. The natural parent needs no process to temporarily deprive his child of its liberty by confining it in his own home, to save it and to shield it from the consequences of persistence in a career of waywardness, nor is the state, when compelled, as parens patriae, to take the place of the father for the same purpose, required to adopt any process as a means of placing its hands upon the child to lead it into one of its courts. When the child gets there and the court, with the power to save it, determines on its salvation, and not its punishment, it is immaterial how it got there. The act simply provides how children who ought to be saved may reach the court to be saved." *Commonwealth* v. *Fisher*, 213 Pa. 48, 53, 62 A. 198, 200 (1905).

This new agency—which stood in the shoes of the parent or guardian—was to draw on all the medical, psychological, and psychiatric knowledge of the day and transform the delinquent. These experts motivated by love were to transform troubled children into normal ones, saving them from criminal careers.

Many things happened that prevented this dream from becoming a widespread reality. First, municipal budgets were not equal to the task of enticing experts to enter this field in large numbers. Second, such experts as we had, notably the psychiatrists and analysts, were drawn away by the handsome fees they could receive for rehabilitating the rich. Third, the love and tenderness alone, possessed by the white-coated judge and attendants, were not sufficient to untangle the web of subcon-

scious influences that possessed the troubled youngster. Fourth, correctional institutions designed to care for these delinquents often became miniature prisons with many of the same vicious aspects as the adult models. Fifth, the secrecy of the juvenile proceedings led to some over-reaching and arbitrary actions.

As Mr. Justice Fortas stated in *Kent* v. *United States,* 383 U. S. 541, 556: "There is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children."

In *Kent,* the Court held that a valid waiver of the "exclusive" jurisdiction of the Juvenile Court of the District of Columbia required "a hearing, including access by . . . counsel to the social records and probation or similar reports which presumably are considered by the court, and . . . a statement of reasons for the Juvenile Court's decision." *Id.,* at 557. Although the opinion in that case emphasized that "the basic requirements of due process and fairness" be satisfied in such proceedings, *id.,* at 553, the decision itself turned on the language of a federal statute.

The first expansive treatment of the constitutional requirements of due process in juvenile court proceedings was undertaken in *In re Gault,* 387 U. S. 1. That case involved a 15-year-old boy who had been committed by an Arizona juvenile court to the State Industrial School "for the period of his minority, unless sooner discharged by due process of law" for allegedly making lewd telephone calls. The Court in *Gault* abandoned the view that due process was a concept alien to the philosophy and work of the juvenile courts. Mr. Justice Fortas, speaking for the Court, stated: "Under our Constitution, the condition of being a boy does not justify a kangaroo court." *Id.,* at 28. The Court held that a juvenile is entitled to adequate and timely notice

of the charges against him, the right to counsel, the right to confront and cross-examine witnesses, and the privilege against self-incrimination.

Since the decision in *Gault*, lower courts have divided on the question whether there is a right to jury trial in juvenile proceedings. Those courts which have granted the right felt that it was implicit in *Gault*. *Nieves* v. *United States*, 280 F. Supp. 994 (D. C. S. D. N. Y. 1968); *Peyton* v. *Nord*, 78 N. M. 717, 437 P. 2d 716 (1968); *In re Rindell*, 2 BNA Cr. L. 3121 (Providence, R. I., Fam. Ct., Jan. 1968). Those who have denied the right have reasoned either that jury trial is not a fundamental right applicable to the States or that it is not consistent with the concept of a juvenile court. *People* v. *Anonymous*, 56 Misc. 2d 725, 289 N. Y. S. 2d 782 (Sup. Ct. 1968); *Commonwealth* v. *Johnson*, 211 Pa. Super. 62, 234 A. 2d 9 (1967). *Duncan* and *Bloom* have negated the former reason. Whether a jury trial is in conflict with the juvenile court's underlying philosophy is irrelevant, for the Constitution is the Supreme Law of the land.

Given the fundamental nature of the right to jury trial as expressed in *Duncan* and *Bloom*, there is, as I see it, no constitutionally sufficient reason to deprive the juvenile of this right. The balancing of the rehabilitative purpose of the juvenile proceeding with the due process requirement of a jury trial is a matter for a future Constitutional Convention.

The idea of a juvenile court certainly was not the development of a juvenile criminal court. It was to have a healthy specialized clinic, not to conduct criminal trials in evasion of the Constitution and Bill of Rights. Where there is a criminal trial charging a criminal offense, whether in conventional terms or in the language of delinquency, all of the procedural requirements of the Constitution and Bill of Rights come into play.

I would reverse this judgment.